## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **LARA W. SWINDLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | **CASE NO. CV 2:09-cv-1458-SLB** |
| **MIKE HALE, in his official capacity;** ) | |
| **RANDY STONE, in his individual** ) | |
| **capacity; and DAVID NEWTON, in** ) | |
| **his individual capacity,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM OPINION

This case is currently before the court on defendant Mike Hale's ("Sheriff Hale")
Motion for Summary Judgment. (Doc. 38.)[1] Plaintiff Lara W. Swindle ("plaintiff") has sued
Sheriff Hale, in his official capacity, alleging sexual harassment and retaliation in violation
of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17.[2] (*See* doc. 1.)
Upon consideration of the record, the submissions of the parties, and the relevant law, the
court is of the opinion that Sheriff Hale's Motion for Summary Judgment, (doc. 38), is due
to be granted.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

[2] Sheriff Hale, in his official capacity, is plaintiff's employer for Title VII purposes. *See
Welch v. Laney,* 57 F.3d 1004, 1011 (11th Cir. 1995).

# I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655(1962) (per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.  FACTUAL AND PROCEDURAL HISTORY[3]

### A.  THE CLAIMS AND INVOLVED PERSONS

Plaintiff was employed with the Jefferson County Sheriff's Office ("JCSO") from May of 2006 until her resignation on February 26, 2010.  (Doc. 38-2 at 3 & 18.) Defendant David Newton ("Newton"), a Jefferson County deputy sheriff, was plaintiff's supervisor from May of 2006 until March 26, 2008.  (Doc. 38-3 at 6; doc. 38-4 at 39.) Defendant Randy Stone ("Stone") was also a Jefferson County deputy sheriff.  Although Stone was not plaintiff's direct supervisor, Stone had the authority to assign plaintiff work and plaintiff had to follow Stone's instructions.  (Doc. 38-4 at 61; doc. 51-22 ¶ 2.) Plaintiff claims that Newton and Stone sexually harassed her on various occasions starting in May of 2006 and ending some time between February 27, 2008 and March 27, 2008.  (Doc. 38-4 at 38-58 & 60-67; doc. 51-22 ¶¶ 7-8; doc. 38-14 at 16.)  Plaintiff claims that Sheriff Hale is legally responsible for the hostile work environment caused by Stone, Newton, and other ranking deputies.  (Doc. 51-19; doc. 38-27; *see generally* doc. 1.) Plaintiff also claims that after she reported Newton and Stone's actions, defendant discriminated against her on the basis of her sex and retaliated against her.  (Doc. 38-4 at 110-172; doc. 38-5 at 173-87; doc. 38-3 at 5-6 & 8-9.)  The only claims pending against

_____

[3] As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to plaintiff, the non-movant.  Although the evidence in conflict on issues of fact may be set forth herein, all disputed facts are ultimately resolved in plaintiff's favor, and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

Sheriff Hale are plaintiff's Title VII claims for sex discrimination and retaliation. (*See* doc. 19 at 11-13.)

## B.  PLAINTIFF'S EMPLOYMENT

Plaintiff was a Laborer III assigned to the weight crew in the Bessemer Division of the JCSO.  (Doc. 38-2 at 3; doc. 38-4 at 29.)  Plaintiff worked as a laborer from May of 2006 until October 3, 2009, when she and the weight crew were put on administrative leave in the wake of Jefferson County's budget problems. (Doc. 38-2 at 7-8 & 19; doc. 38-5 at 187-189.)  During her employment, plaintiff received raises and her pay was never decreased before she and the rest of the weight crew were placed on administrative leave. (Doc. 38-5 at 189.)  Plaintiff, however, claims that her compensation was diminished because she was forced to use her sick leave and vacation time when she should have been placed on injury-with-pay leave.  (Doc. 38-4 at 144-48.)  Plaintiff resigned from JCSO after being on administrative leave for several months.  (Doc. 38-2 at 3; doc. 38-5 at 189.)

## C.  THE SEXUAL HARASSMENT POLICY

Chapter 4 of the JCSO Policy and Procedure Manual provides: "Members shall be subject to and comply with the Jefferson County Sexual Harassment Prevention and Grievance Policy [("the Sexual Harassment Policy")]."  (Doc. 38-7 at 27.)  The Sexual Harassment Policy is set forth in Chapter 8 of the JCSO Policy and Procedure Manual. (*Id.* at 14 & 28-32.)  The Sexual Harassment Policy defines and prohibits sexual

5

harassment, and prohibits the tolerance of sexual harassment by a supervisor.  (*Id*. at 28-29.)  The Sexual Harassment Policy requires that employees promptly report acts of sexual harassment to, among others, their supervisor or supervisor's supervisor (assuming the employee's supervisor is the harasser).  (*Id*. at 30.)  If uncomfortable reporting to their supervisor, employees may bypass the supervisor and report the harassment to the Jefferson County Employee Relations Officer or the County Attorney.  (*Id*.)  The Sexual Harassment Policy applies to "Jefferson County employees[,]" is not directed solely to the JCSO, and does not distinguish between classified and unclassified employees.  (*Id.* at 28.)

Plaintiff received a copy of the JCSO Policy and Procedure Manual either when she was hired in May of 2006 or at an orientation she attended for new Jefferson County employees in June of 2006.  (Doc. 38-4 at 16-20.)  The Sexual Harassment Policy was in the JCSO Policy and Procedure Manual that plaintiff received.  (*Id.* at 19-20; doc. 38-8 at 3.)  Plaintiff went over the Sexual Harassment Policy when she was hired and was familiar with it.  (Doc. 38-8 at 3.)  Plaintiff also watched a sexual harassment video and received material containing examples of sexual harassment during her orientation.  (Doc. 38-4 at 19.)

## D.  PLAINTIFF'S ALLEGATIONS CONCERNING NEWTON

Plaintiff claims that Newton played a role in causing a hostile work environment by engaging in the following acts: (1) responding to her requests for vacation by telling

her several times that he would have to "spank . . . [her] little naked ass"; (2) by grabbing her breast on one occasion; (3) by indicating on several occasions that he wanted her to unbutton her shirt; and (4) by standing behind her and pressing his genitals into her backside on more than one occasion.  (*Id.* at 38-58; doc. 38-14 at 14-15.)

### 1.  Spanking Comments

Plaintiff had a beach trip planned for June of 2006.  (Doc. 38-4 at 42.)   Plaintiff had previously mentioned to Newton that she needed to take some time off work for the trip, and he told her it would be handled.  (*Id.* at 41.)  While Newton was taking plaintiff home from work one day, plaintiff was on the phone with a girlfriend discussing the upcoming trip and again mentioned to Newton that she needed to take some time off. (*Id*. at 41-42.)  Newton responded by telling plaintiff that he would have to take her in his office and "spank that naked little ass." (*Id.* at 41.)   Plaintiff testified that she thought Newton "was just joking" and "just kind of chuckled thinking ha-ha" and continued her conversation with her girlfriend.  (*Id.* at 43; doc. 38-5 at 210.)[4]  She also testified that the comment "unnerve[d]" her.  (Doc. 38-5 at 212.)  Plaintiff never told Newton not to say that to her or that she was offended by the comment.  (Doc. 38-4 at 43.)  Plaintiff testified that she did not report Newton's comments to anyone at the JCSO because Newton had told her that she was "not to talk with other deputies" or that if she needed a sergeant she

---

[4] In Plaintiff's Statement of Additional Undisputed Facts, (doc. 50 at 10-29), plaintiff states that "Swindle did not think the comments were funny . . . ." (*id.* at 14).  Plaintiff, however, testified in her deposition that she thought he was joking and chuckled. (*See* doc. 38-4 at 43 & 210.)

was "to come to him and he would go to the sergeant." (*Id.* at 44.)   This incident occurred before she attended the orientation. (*Id.* at 44-45.)

Plaintiff had another beach trip planned for September of 2006. (*Id*. at 45.)   In August of 2006, plaintiff asked Newton if she could mark on the calendar that she would be off work. (*Id.*)   Newton told her she could mark it off on the calendar, but that "I'm still going to have to spank that naked ass." (*Id.*)   Plaintiff reacted by trying "to blow it off with a laugh." (*Id.* at 46.)   Plaintiff testified that she did not report Newton's comments to anyone at the JCSO because Newton had told her not to speak with other deputies or sergeants and she "was not even sure who the next person for me to go was." (*Id.* at 46-47.)   This incident occurred after plaintiff attended the orientation. (*Id.* at 47.)

### 2. Grabbing Plaintiff's Breast

For the first few months that plaintiff worked for the JCSO, Newton would pick plaintiff up at her house in the mornings and bring her home at the end of the day. (*Id.* at 33-34.)   One day when Newton was taking plaintiff home, Newton reached over and put his right hand over plaintiff's shirt on her breast for at least a minute. (*Id.* at 51-52; doc. 38-5 at 213-14.)   Plaintiff reacted by turning her head the other direction, "just hoping he would stop." (Doc. 38-4 at 53.)   Newton removed his hand when a truck was approaching from the other direction. (*Id.* at 51.)   Plaintiff testified that she was "nauseated" by Newton's conduct. (*Id.* at 52.)   Plaintiff did not tell Newton to stop grabbing her breast or report Newton's conduct to anyone at the JCSO. (*Id.* at 53-54.)

Plaintiff told Newton that she did not want him to pick her up anymore because she felt that Newton's wife was uncomfortable with the situation and plaintiff did not want to cause Newton marital problems.  (Doc. 38-5 at 202-03.)  Plaintiff testified that she used the marital problems as an excuse and that she really told him not to pick her up in the future because she was tired of him touching her and looking at her and did not want to ride alone in the car with him anymore.  (*Id.* at 203-04.)

### 3. Requests For Plaintiff To Unbutton Her Shirt

In August or September of 2006, plaintiff and the weight crew were working a wreck scene.  (Doc. 38-4 at 48.)  Plaintiff, Newton, and another laborer got into the weight truck to cool off, and the other laborer fell asleep.  (*Id.* at 48-49.)  Newton then looked at plaintiff, motioned towards his shirt, and "mouthed . . . [u]nbutton."  (*Id.* at 49.) Newton did this a few more times while he was in the car with plaintiff on this particular occasion.  (*Id.* at 49.)  Plaintiff did not say anything in response to Newton.  (*Id.* at 50.) She did not tell him not to mouth "unbutton" or that she was offended by his comments. (*Id.*)  Plaintiff did not report Newton's actions to anyone at the JCSO because Newton was "intimidating" and she was "scared" of him.  (*Id.* at 51.)[5]

_____

[5] In Plaintiff's Statement of Additional Undisputed Facts, (doc. 50 at 10-29), plaintiff states that "Newton asked Swindle to unbutton her blouse a number of times over the course of her employment," (*id.* at 15).  As support, plaintiff cites doc. 38-4 at 48-51 & 97-99, doc. 38-14 at 14, and doc. 38-15 at 2.  Doc. 38-15 at 2 supports the proposition that Newton asked her to unbutton her blouse on multiple occasions, but plaintiff has not provided any details regarding these instances.

### 4.  Newton Pressing His Genitals Into Plaintiff's Backside

On occasion, Newton would lean-up against plaintiff's backside when she was writing something "like he was seeing what [she] . . . was writing."  (Doc. 38-4 at 54.) On these occasions, Newton would press his genitals against plaintiff's backside for a couple of minutes.  (*Id.* at 55-56.)  Plaintiff never told Newton to stop pressing his genitals against her backside or that it made her uncomfortable.  (*Id.* at 56.)  Plaintiff did not report Newton pressing his genitals against her to anyone at the JCSO.  (*Id.* at 57.) Plaintiff did not consider Newton's actions to be sexual harassment at the time they occurred.  (*Id.* at 103.)  However, plaintiff did consider Newton's pressing his genitals into her backside to be sexual harassment after "it had kind of been brought to . . . [her] attention," which was "probably" after she complained about the harassment on March 26, 2008.  (*Id.* at 103-04.)  Plaintiff's Declaration states that "[u]p until March 2008 . . . Newton continued to rub up against me and press himself against me."  (Doc. 51-22 ¶ 5.)

### E.  PLAINTIFF'S ALLEGATIONS CONCERNING STONE

Plaintiff claims that Stone sexually harassed her by: (1) asking her to unbutton her shirt on several occasions; (2) putting her hand on his erect penis and saying: "You made this happen, now you need to take care of it"; and (3) reaching for a cell phone that was between her legs and touching her thigh in the process.  (Doc. 38-4 at 60-77.)

### 1.  Requests For Plaintiff To Unbutton Her Shirt

Starting in July or August of 2006, Stone would pull-up in his patrol car, motion for plaintiff to come-over to his car, and then ask her to unbutton her shirt and let him see her breasts.  (*Id.* at 62-63.)  Plaintiff would respond by saying "[n]o, I don't think so," by "walk[ing] off," or by telling him "I'm not unbuttoning my blouse . . . I hate that for you." (*Id.* at 63-64.)  Plaintiff testified that Stone would ask her to unbutton her shirt about every other week, (*id.* at 63), until after the first three or four times when she stopped going over to his car, (*id.* at 65).  Stone testified that he asked plaintiff to "give . . . [him] a button several times" and that "it was like -- it was like a joke between us."  (Doc. 51-1 at 73.)  Plaintiff never asked Stone to stop asking her to unbutton her top or give him a button and she never told him she was offended by it.  (Doc. 38-4 at 64.)  However, plaintiff did mention to Newton that Stone "would make remarks to me that I did not like." (*Id.* at 64-65.)   Newton responded by saying "Ah, [Stone is] . . . just a pervert." (*Id.* at 65.)  Plaintiff hoped that by mentioning Stone's remarks to Newton that a "light bulb would go off with Newton and he would also back off with his remarks or the rubbing up against . . . [her]."  (*Id.* at 67.)  These incidents occurred after plaintiff attended the orientation.  (*Id.* at 67.)

### 2.  Putting Plaintiff's Hand on his Penis

In early winter 2007, Stone approached plaintiff while she was asleep on a couch at the Sylvan Springs substation.  (*Id.* at 73-74; doc. 38-5 at 222.)  As she slept, Stone

grabbed plaintiff's hand, placed it on his erect penis, and said "You made this happen, now you need to care of it."  (Doc. 38-4 at 73 & 75-76.)  Plaintiff jerked her hand and responded "No, and you can take care of that yourself."  (*Id*. at 73.)  Plaintiff then left the room.  (*Id*. at 73-74.)  Plaintiff did not tell Stone that she found this conduct offensive but "hoped [that] [her] actions spoke clear enough."  (*Id*. at 76.)  Plaintiff did not report this incident to anyone at the Sheriff's Office.  (*Id*. at 76-77.)

### 3. Grabbing Plaintiff's Cell Phone/Touching Plaintiff's Inner Thigh

Sometime in late February or early March 2008, while stationed at a roadblock, plaintiff was sitting in a weight crew truck monitoring the radar detector.  (*Id*. at 69.)[6] Stone approached the window, reached for plaintiff's cell phone between her legs, and said "Give me that phone, girl."  (*Id*.)  Plaintiff slapped Stone's hand away and said "Leave my phone alone, you have your own cell phone."  (*Id*. at 69-70.)  Stone's hand made contact with plaintiff's inner thigh.  (*Id*. at 71.)  Plaintiff considered Stone's conduct to be sexual.  (*Id*. at 72.)  She did not report the incident to anyone in the Sheriff's Office.  (*Id*. at 72.)

## F.  PLAINTIFF COMES FORWARD AND THE ENSUING INVESTIGATION

### 1. March 25-26, 2008

On March 25, 2008, plaintiff called Sergeant Michael Saxton ("Sergeant Saxton") to discuss various problems the weight crew had with Newton.  (*Id*. at 80-81.)  Sergeant

---

[6] As discussed later in this opinion, plaintiff has given varying dates for this incident.

Saxton scheduled a meeting for the following morning.  (*Id*. at 81.)  Plaintiff made no

mention about her sexual harassment allegations against Newton or Stone at this time.

(*Id*. at 84.)  Before speaking with Sergeant Saxton, plaintiff had compiled a list of

problems she had with Newton to use as guidance during their discussion.  (*Id*. at 105-06;

doc. 38-10.)  The list did not contain any reference to sexual harassment generally or

about plaintiff's specific sexual harassment allegations against Newton and Stone.  (*See

generally* doc. 38-10.)

     Newton and plaintiff rode together to the March 26, 2008 meeting with Sergeant

Saxton.  (Doc. 38-4 at 81-83.)  During the ride, plaintiff mentioned to Newton that they

needed to discuss the weight crew's work-related problems with him before the meeting,

or she would "have no choice but to bring forth all the sexual harassment that [she] ha[d]

endured . . . ."  (*Id*. at 83.)

     Sergeant Saxton and Lieutenant Mark Farley ("Lieutenant Farley") met with

Newton separately before meeting with the weight crew.  (*Id*. at 82 & 86.)  After meeting

with Newton, Sergeant Saxton and Lieutenant Farley held a meeting with the weight crew

and Newton both present.  (*Id*. at 85-86.)  When this meeting began, Sergeant Saxton or

Lieutenant Farley opened by stating that the weight crew apparently had problems

following Newton's orders, to which plaintiff responded, "Well, did Deputy Newton

bother to inform you of all the sexual harassment remarks and things that he has done

towards me[?]"  (*Id*. at 86.)  Sergeant Saxton and Lieutenant Farley immediately ended

the meeting following plaintiff's remark, went to find the Captain, and separated plaintiff

from the weight crew and Newton.  (*Id*. at 86-87.)

Sergeant Saxton and Lieutenant Farley, with only plaintiff present, then asked

plaintiff to elaborate on her sexual harassment allegations.  (*Id*. at 87.)  Plaintiff informed

Sergeant Saxton and Lieutenant Farley of Newton's spanking comments, his grabbing of

her breast, and Stone's requests for her to unbutton her shirt.  (*Id*. at 89-91.)  Plaintiff also

told Sergeant Saxton and Lieutenant Farley that she had not come forward with these

complaints because she hoped that the conditions with Newton and Stone would improve.

(*Id*. at 91-92.)  Later that day, plaintiff filed a Personnel Complaint wherein plaintiff

reported Newton's spanking comments, his requests to unbutton her blouse, and Stone's

"inappropriate comments to[wards] her."  (Doc. 38-11.)  The JCSO placed Newton on

administrative leave after plaintiff filed her Personnel Complaint on March 26, 2008.

(Doc. 38-12.)  Prior to plaintiff's Personnel Complaint, Newton and Stone had never been

charged with or investigated for sexual harassment during their employment with the

JCSO.  (Doc. 38-13 ¶ 2.)

### 2.  The Ensuing Investigation and its Results

On March 27, 2008, the day after plaintiff reported her sexual harassment

allegations against Stone and Newton, plaintiff was interviewed by Sergeant Jim West

("Sergeant West") at the Birmingham Internal Affairs office.  (Doc. 38-4 at 94-96 & 98-

99; doc. 38-14.)  With respect to Newton, plaintiff told Sergeant West about his spanking

comments, his gestures towards plaintiff to unbutton her blouse, and the breast-grabbing

incident. (Doc. 38-14 at 3-5, 13-15 & 17.)  Plaintiff mentioned that she had not told

Newton to refrain from making inappropriate remarks because she feared losing her job,

and she "did not want to cause [Newton] marital problems or job problems."  (*Id*. at 16.)

With respect to Stone, plaintiff told Sergeant West about his requests for plaintiff to

unbutton her shirt and his attempt to grab plaintiff's cell phone from between her legs.

(*Id*. at 15-17.)

      After plaintiff's initial interview with Sergeant West, the investigation was

transferred from Internal Affairs in Birmingham to the Bessemer Division, and Captain

Anthony Pippin ("Captain Pippin") assigned Sergeant Bill Franklin ("Sergeant Franklin")

to the investigation.  (Doc. 38-17 at 35-36; doc. 38-18 at 27.)  Sergeant Franklin

"somewhat" considered himself friends with Newton and Stone, and plaintiff raised

concerns to Sergeant Franklin about these preexisting friendships after he was assigned to

the investigation.  (Doc. 38-17 at 44-45 & 47.)  Sergeant Franklin advised plaintiff that

she needed to submit a letter through the chain of command expressing such concerns,

and Sergeant Franklin wrote a letter to Lieutenant Charles Buchannon ("Lieutenant

Buchannon") informing him of plaintiff's reservations about his partiality.  (*Id*. at 45; doc.

38-19.)  Thereafter, Lieutenant Buchannon wrote a letter to Captain Pippin stating that he

had "the highest confidence in [Sergeant Franklin's] competency to perform the

[investigation], [and] his honesty and integrity to report the fact[s] without biases."  (Doc.

15

38-20.)    Lieutenant Buchannon instructed Sergeant Franklin to continue conducting the

investigation.  (*Id.*)  According to Sergeant West, the investigator conducts the

investigation and forwards his findings up the chain of command for approval.  (Doc. 38-

18 at 95.)

On April 7, 2008, Sergeant Franklin interviewed plaintiff at the Bessemer office.

(Doc. 38-4 at 98; doc. 38-8.)  Plaintiff made her allegation about Stone placing her hand

on his erect penis for the first time during this interview.  (Doc. 38-8 at 22-23.)  Plaintiff

explained to Sergeant Franklin that she waited two years to report Newton and Stone's

inappropriate remarks and conduct because she "had a very jealous husband that would

want to retaliate" and she had "tried to cover up for people and makes excuses for

everyone involved in it."  (*Id.* at 27.)  Explaining why she was now coming forward,

plaintiff told Sergeant Franklin, "There's a point in time I guess, maybe (can hear

sobbing) I finally have a backbone and I can stand up for myself and I'm sick of it."  (*Id.*)

Plaintiff volunteered to confirm the truthfulness of her statements through a polygraph

examination.  (*Id.*)

Sergeant Franklin also conducted interviews with Newton and Stone.  (Doc. 38-16

at 12-15.)  Newton denied all of plaintiff's allegations.  (*Id.* at 12-13.)  Stone admitted

most of plaintiff's allegations.  (*Id.* at 13-15.)  The JCSO placed Stone on administrative

leave on April 9, 2008.  (Doc. 38-22.)  Sergeant Franklin also interviewed plaintiff's ex-

16

husband, plaintiff's fiancé, the members of the weight crew, and a potential witness to plaintiff's sexual harassment allegations.  (*See generally* doc. 38-16.)

On April 28, 2008, Newton underwent a polygraph examination.  (Doc. 51-2, Ex. B-7.)  Newton denied all of plaintiff's allegations, and the polygraph charts indicated "deceptive reactions."  (*Id*.)  The examiner concluded that Newton's polygraph result was "Deception Indicated."  (*Id*.)  Plaintiff underwent a polygraph examination on May 6, 2008.  (Doc. 38-4 at 100-01; doc. 38-9 at 2.)  The polygraph charts indicated a "significant response" to the question "Did you lie when you said Deputy Newton touched your butt with his privates?"  (Doc. 38-9 at 3.)  A significant reaction generally indicates deception.  (Doc. 38-18 at 72-73.)  However, the examiner noted that plaintiff's significant reaction may be attributable to the fact that plaintiff "did not consider that to be sexual harassment until a co-worker . . . brought it to her attention."  (Doc. 38-9 at 3.)

On May 20, 2008, Sergeant Franklin ruled that the investigation into plaintiff's sexual harassment allegations concerning Newton was "inconclusive."  (Doc. 38-23 at 3.)  While investigating plaintiff's sexual harassment allegations, Sergeant Franklin received information that Newton had instructed the weight crew to falsify daily and monthly reports, allowed the weight crew to "run radar," and made racially-insensitive remarks to an African American member of the weight crew.  (*See generally* doc. 38-24.)  Sergeant Franklin investigated these allegations and ultimately found them to be true.  (*Id*. at 8-9.)  Newton was subsequently terminated on July 8, 2008.  (Doc. 38-26.)  Stone was

17

terminated on June 6, 2008.  (Doc. 38-25.)  Newton and Stone's termination letters

advised them of their right to appeal to the Personnel Board of Jefferson County

("PBJC").  (*Id*.; doc. 38-26.)

## G.  ALLEGED INSTANCES OF DISCRIMINATION AND/OR RETALIATION

After coming forward with her allegations against Newton and Stone, plaintiff

claims that she was subjected to sexual discrimination and unlawful retaliation.  Plaintiff

claims that the following incidents are demonstrative of unlawful discrimination and

retaliation following her complaints of sexual harassment.

### 1.  Proposed Reassignment to Bessemer Office

On March 26, 2008, shortly after reporting her sexual harassment allegations to

Sergeant Saxton and Lieutenant Farley, Lieutenant Farley told plaintiff that she would be

reassigned to work in the Bessemer office and that Newton would continue working with

the weight crew.  (Doc. 38-3 at 8; doc. 38-4 at 166.)  Lieutenant Farley then changed his

mind and decided to place plaintiff on administrative leave.  (Doc. 38-3 at 8; doc. 38-4 at

166-67.)  Later that afternoon, plaintiff received a call from Lieutenant Farley informing

her that she would not be placed on administrative leave.  (Doc. 38-3 at 8; doc. 38-4 at

167.)  Plaintiff was not placed on administrative leave at this time.  (Doc. 38-4 at 167.)

### 2.  Sexual Harassment Investigation Transferred to Bessemer Division / Employees Learning of Plaintiff's Sexual Harassment Complaint

On April 1, 2008, plaintiff learned that her sexual harassment investigation had

been transferred from Internal Affairs to the Bessemer Division, the division where

18

plaintiff was currently assigned.  (Doc. 38-3 at 5.)  The transfer led to the contents of her

sexual harassment complaint being disseminated to a number of people in the Bessemer

Division.  (*Id*. at 5 & 8.)  Plaintiff became the subject of "sexual gossip" and "was

harassed and demeaned because of [her] complaint."  (*Id*. at 5.)  According to plaintiff,

the subject matter of her sexual harassment complaint was to be kept confidential.  (*Id*. at

8.)

### 3.  Deputy Arnold's Refusal to Provide Plaintiff with Transportation

Deputy Billy Arnold ("Deputy Arnold") served as plaintiff's supervisor in April of

2008.  (*Id*. at 6.)  Deputy Arnold and the weight crew would meet at the Bessemer office

before traveling together to the work assignment.  (Doc. 38-28 at 35.)  On April 14, 2008,

certain members of the weight crew suggested meeting at the Sylvan Springs substation

so that Deputy Arnold could provide them with transportation to the Bessemer office.

(*Id*. at 36; doc. 38-29 at 3.)  Deputy Arnold objected to this request because he had a 6:30

a.m. roll call at the Bessemer office, and because other members of the weight crew lived

closer to the Bessemer office.  (Doc. 38-28 at 36.)  Deputy Arnold raised his objections to

Sergeant Saxton in front of plaintiff and the entire weight crew.  (*Id*. at 36-37, 41 & 44.)

Deputy Arnold testified that he expressed his discomfort with potentially being alone in a

car with plaintiff because of his personal belief that "a man and a woman shouldn't . . . be

seen" together alone.  (*Id*. at 37.)  Plaintiff, however, testified that Deputy Arnold told

Sergeant Saxton that he did not want plaintiff falsely accusing him of "something that

[he] didn't do." (Doc. 38-4 at 159-60 & 162.)  Plaintiff also testified that Deputy Arnold

spoke directly to her and said "You're not going to make allegations against me like the

other deputies." (*Id*. at 163.)  Deputy Arnold's remarks upset plaintiff, and Sergeant

Saxton allowed her to go home for the day. (*Id*.)

Sergeant Saxton decided that Deputy Arnold would have to provide transportation

to the members of weight crew meeting at Sylvan Springs, and Deputy Arnold complied

with Sergeant Saxton's order. (Doc. 38-28 at 37-39; doc. 38-4 at 164.)  Deputy Arnold

later apologized to plaintiff over the telephone. (Doc. 38-28 at 39-40; doc. 38-4 at 164.)

Deputy Arnold never refused to provide plaintiff with transportation after this date. (Doc.

38-4 at 164.)

### 4.  Deputy Arnold Requiring Plaintiff to Unload Weight Scales by Herself

One day while preparing to weigh trucks, Deputy Arnold instructed plaintiff to

unload the four, fifty-pound scales and set them out in the road. (Doc. 38-5 at 177-78.)

The normal practice was for each weight crew member to unload one scale, but Deputy

Arnold instructed weight crew members Mike Winton ("Winton") and Allan McClinton

("McClinton") to direct traffic. (*Id*. at 177 & 182.)  The other weight crew member,

Doug Blanchard, was "very weak" and always needed assistance unloading the scales.

(*Id*. at 182.)  Winton offered to help plaintiff unload the scales, but Deputy Arnold said

"No, she is to get the scales all by herself." (*Id*. at 177.)  Plaintiff testified that no other

weight crew member had ever been ordered to unload all the scales. (*Id*. at 182.)  After

20

the trucks had been weighed, the other crew members assisted plaintiff load the scales

back into the truck because they were "upset" with Deputy Arnold and "did not care what

[he] said." (*Id*. at 183.)  Plaintiff loaded two of the four scales back into the truck. (*Id*.)

### 5. Deputy Arnold Transporting Plaintiff in a Patrol Car

Plaintiff says Deputy Arnold also harassed and retaliated against plaintiff when he

forced the entire weight crew to ride in a hot and cramped patrol car "with a cage" rather

than the truck they normally used. (Doc. 38-4 at 172; doc. 38-5 at 173-76.) Plaintiff says

that while this action was not specifically directed against her, the fact that the group was

being punished was a method of making the rest of the crew angry with her. (Doc. 50 at

44.)

### 6. Performance Counseling Statement, Investigation, and Polygraph Test

On July 14, 2008, Deputy Ron Michael ("Deputy Michael") stopped by the Sylvan

Springs substation to change clothes. (Doc. 38-30 at 22; doc. 51-6, Ex. D-13.)

According to Deputy Michael, all the lights were off when he entered the substation, and

candles were lit throughout the rooms. (Doc. 38-30 at 22.) Deputy Michael noticed

plaintiff's fiancé, retired Sergeant Cecil Tidmore ("Sergeant Tidmore"), sitting on the

living room sofa. (*Id*.) Deputy Michael then observed plaintiff enter the living room, sit

next to Sergeant Tidmore, and begin twirling his hair and stroking his calf with her foot.

(*Id*. at 23.) Although Deputy Michael had no intention of filing a formal complaint

21

against plaintiff, he mentioned the incident to Sergeant Wallace because he considered plaintiff's behavior unprofessional.  (Doc. 38-30 at 43-44; doc. 51-6, Ex. D-13.)

On July 24, 2008, Lieutenant David McAnally ("Lieutenant McAnally") and Sergeant Wallace had a counseling session with plaintiff regarding her behavior on July 14, 2008.  (Doc. 51-6, Ex. D-14; doc. 38-37 at 2.)  Lieutenant McAnally presented plaintiff with a Performance Counseling statement.  (Doc. 51-6, Ex. D-15; doc. 38-4 at 126.)  The Performance Counseling statement found that plaintiff's conduct and behavior at the Sylvan Springs substation did not comply with sections 4-01.20(F) and 4-03.05 of the JCSO Policies and Procedures Manual.[7]  (Doc. 51-6, Ex. D-15.)  Plaintiff refused to sign the form because she considered her signature an admission of guilt.  (Doc. 38-4 at 126.)  Plaintiff asked Lieutenant McAnally whether "he was picking on her . . . for prior issues."  (Doc. 51-6, Ex. D-14.)  Plaintiff understood that a counseling session was a form of discipline that must be preceded by a formal complaint.  (Doc. 38-37 at 4.)  Based on Lieutenant McAnally's representations during the meeting, plaintiff believed the matter had been resolved.  (*Id*.)

On July 29, 2008, Lieutenant McAnally sent a letter to Captain Cleveland Moore ("Captain Moore") regarding his meeting with plaintiff.  (Doc. 51-11, Ex. H-21.)  In the

---

[7]  Section 4-01.20(F) reads: "Members shall display respect for their supervisors, subordinates, and associates."  (Doc. 51-6, Ex. D-16.)  Section 4-03.05 reads: "While on duty . . . [m]embers shall devote their time and attention to the service of the County and the Sheriff's Office and shall direct and coordinate their efforts in a manner which will establish and maintain the highest standard of efficiency."  (*Id*.)

letter, Lieutenant McAnally states that "[plaintiff] assured me there had been no inappropriate conduct and that there would be no inappropriate conduct . . . . [and] I recommend this matter be considered closed at this time." (*Id*.) On August 14, 2008, Sergeant Wallace sent Captain Moore a letter describing Deputy Michael's allegations. (Doc. 51-12, Ex. H-30.) The letter informed Captain Moore that "Deputy Michael shared this information with me in confidence, and has no desire to become involved in the situation and controversy that previously involved [plaintiff]." (*Id*.)

On August 20, 2008, Captain Moore and other members of Internal Affairs interviewed plaintiff about her counseling session with Lieutenant Farley and the allegations of Deputy Michael. (*See generally* doc. 38-31.) Captain Moore was concerned that the weight crew lacked proper supervision, as suggested by Deputy Michael's allegations. (Doc. 38-32 at 12-13.) Plaintiff left the meeting confused and "wondering why they were out to get me[,] and if it was because of the two sexual harassment charges [she] filed against Deputy Newton and Deputy Stone in March 2008." (Doc. 38-37 at 6-7.)

On September 9, 2008, plaintiff was required to undergo a polygraph examination concerning the events of July 14, 2008. (Doc. 38-4 at 130-31; doc. 38-33.) The test results of plaintiff's examination showed "No Deception Indicated." (Doc. 38-33.) Captain Moore informed plaintiff that she passed the polygraph test after receiving her test results, and told her the matter was closed. (Doc. 38-4 at 131; doc. 38-36 at 69.)

23

Pursuant to JCSO custom and practice, the Performance Counseling statement was not placed in plaintiff's personnel file because the matter was resolved in her favor. (Doc. 38-13 ¶ 3.) Deputy Michael was not required to confirm the truthfulness of his allegations through a polygraph examination. (Doc. 38-36 at 54.)

### 7. Denial of Medical Care and Leave

On or about August 21, 2008, plaintiff met with Lieutenant McAnally, who had recently instructed the weight crew to start meeting at the Oak Grove substation to begin their workday instead of meeting at the Sylvan Springs substation. (Doc. 38-4 at 134-35.) Plaintiff lived between the Oak Grove and Sylvan Springs substations, but the other weight crew members lived closer to the Sylvan Springs substation. (*Id*.) Plaintiff questioned Lieutenant McAnally's decision because the other weight crew members would incur additional gasoline costs. (*Id*. at 135.) Plaintiff told Lieutenant McAnally that his decision "punish[ed] everyone else on the weight detail because they were upset with [her]." (*Id*. at 134.)

Lieutenant McAnally became upset, pointed his finger in plaintiff's face, and said they were going to meet with Captain Moore. (*Id*. at 135.) While meeting with Captain Moore, Sergeant Tidmore arrived at the station, and plaintiff invited him into Captain Moore's office. (*Id*. at 135-36.) Captain Moore became irate, started screaming, and told plaintiff "You don't come in my office and invite people in." (*Id*. at 136.) At this point, plaintiff began having a panic attack. (*Id*. at 137.) After the meeting, plaintiff called her

supervisor, Deputy Charlotte Ryan, who noted that plaintiff "was very upset, crying hysterically saying I can't take this anymore. I think I'm going to have a heart attack, I can't breathe . . . ." (Doc. 51-12, Ex. H-28.)  Plaintiff called Sergeant Wallace who recommended that plaintiff go to the emergency room.  (Doc. 38-4 at 137.)

Plaintiff went to the emergency room at St. Vincent's Hospital and was prescribed Klonopin, an anti-anxiety medication.  (*Id*. at 139 & 142.)  She had insurance issued through the JCSO and used her County insurance card to pay for the treatment.  (*Id*. at 139-40 & 143.)  Plaintiff paid her co-payment as she would if she used the insurance in another matter.  (*Id*. at 141.)  Plaintiff received periodic follow-up treatments after her initial visit, and she used her County insurance card to pay for each visit.  (*Id*. at 143-44.)

Plaintiff's medication and follow-up treatments caused her to take time off work. (*Id*. at 145.)  The JCSO Policy and Procedure Manual provides: "[A]n employee may be placed on administrative leave by a Division Commander when [s]he . . . has been involved in a work related stressful event that may prevent the employee from carrying out h[er] Sheriff's Office duties." (Doc. 51-4 at 93.)   The JCSO, however, denied plaintiff injury-with-pay leave.  (Doc. 38-4 at 145.)  Plaintiff was forced to use sick time and vacation days to cover her absences.  (*Id*.)  Plaintiff testified that other deputies received injury-with-pay leave when they experienced work-related emotional trauma. (*Id*. at 147.)[8]

---

[8]  No specifics were given as to other deputies receiving paid leave after experiencing on the job training.  Plaintiff's testimony on this issue was as follows:  "Well if a deputy goes out

### 8.  Sheriff Hale Does Not Respond to Plaintiff's Grievance

Plaintiff filed a PBJC Employee Grievance ("PBJC Grievance") with the JCSO on August 24, 2008.  (*See generally* doc. 38-37.)  The PBJC Grievance involved the events surrounding Deputy Michael's allegations and the Performance Counseling statement that plaintiff refused to sign.  (*Id.*)  Specifically, plaintiff complained that she was counseled despite no official complaint being filed, and that the JCSO rules she supposedly violated did not apply to her actions on July 14, 2008.  (*Id.* at 7-8.)  On September 17, 2008, plaintiff filed an "Employee's Request to Hearing Officer" with the PBJC because no one "from the upper echelon" had responded to her grievance.  (Doc. 38-38 at 2.)  The PBJC responded to plaintiff's grievance by informing plaintiff that a Laborer III, her job title, is an unclassified position that is not subject to the PBJC Rules and Regulations.  (Doc. 38-39.)  As an unclassified employee, the PBJC informed plaintiff that she had no right to file a grievance under the PBJC Rules and Regulations and that her complaint would not be processed.  (*Id.*)

### 9.  Stone's PBJC Hearing

Stone appealed his termination to the PBJC.  (*See* doc. 38-40; doc. 38-41.)  Plaintiff received a subpoena to testify at Stone's PBJC hearing, but she was not called as a witness.  (Doc. 38-4 at 119.)  Plaintiff testified that this decision allowed Stone to paint a one-sided, unchallenged version of the facts at his PBJC hearing.  (*Id.* at 119-20.)

---

and witnesses a bad call and has nightmares over it, they let him go to a doctor and he gets paid." (Doc. 38-4 at 147.)

Sergeant Franklin, who investigated plaintiff's allegations against Stone, was also not called as a witness.  (Doc. 51-15 at 44.)

At the hearing, Stone told the PBJC hearing officer that his conduct towards plaintiff was "all in fun," that he was "just kidding around," and that "[plaintiff] went along with it."  (Doc. 51-1 at 43.)  The hearing officer ultimately concluded that the evidence presented was insufficient to find Stone guilty of sexual harassment because "the necessary requirement . . . that the alleged conduct must be unwelcome was not substantiated."  (Doc. 38-40 at 12.)  The hearing officer recommended that Stone be reinstated and that his discipline be reduced to a forty-five day suspension without pay. (*Id*. at 14.)  The hearing officer also recommended that Stone "be reassigned to the Corrections Division where he will be under closer supervision."  (*Id*.)  The PBJC adopted the hearing officer's findings of fact and recommendations in full.  (*See* doc. 38-41 at 2-3.)  The JCSO did not appeal the PBJC's decision.  (Doc. 38-4 at 123.)

### 10.  Newton and Stone Return to the Bessemer Division

Newton and the JCSO reached a settlement before his PBJC hearing wherein Newton agreed to a sixty-day suspension without pay followed by three-and-a-half months of administrative leave without pay.  (*See* doc. 38-42.)  After serving their suspensions, Newton and Stone returned to the Bessemer Division at its jail facility. (Doc. 38-4 at 151-52.)  Neither served as plaintiff's supervisor or worked with the weight crew.  (*Id*. at 152.)  Nonetheless, plaintiff saw Newton and Stone "too often" and avoided

27

any interaction with them.  (*Id*. 152-54.)  Plaintiff did not speak with Newton or Stone after they returned to the Bessemer Division.  (*Id*. at 154.)

### III.  DISCUSSION

**A. TIMELINESS OF PLAINTIFF'S EEOC CHARGE**

"As a prerequisite to bringing suit under Title VII, a charge must be filed [by the employee] with the EEOC within 180 days of the date of the act giving rise to the charge."  *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993)(citing 42 U.S.C. § 2000e-5(e)(1)("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . .")).  In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court "clarified the operation of Title VII's timely-filing requirement."  *Ledbetter v. Goodyear Tire and Rubber Co, Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005).  For claims in which the plaintiff alleges that he or she was subjected to a hostile work environment, the Supreme Court held that "consideration of the entire scope of [the] claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."  *Id.* at 1179 (quoting *Morgan*, 536 U.S. at 105).

Plaintiff filed her EEOC Charge on August 21, 2008, (*see* doc. 38-27), and her Amended EEOC Charge on October 21, 2008.  Sheriff Hale contends that plaintiff failed to timely file her EEOC Charge as to her hostile work environment claim.  (Doc. 38-1 at

33.)  Sheriff Hale first contends that "the events that occurred after she reported the sexual harassment on March 26, 2008 were [discrete acts of] retaliation" that are not considered part of plaintiff's hostile work environment claim.  (*Id.* at 34 n.5.)  Sheriff Hale then contends that plaintiff's allegations "against Newton and Stone involve events that took place in 2006 and 2007, well more than 180 days before Swindle filed her EEOC Charge."  (*Id.* at 33.)

In response to Sheriff Hale's first argument, plaintiff contends that her "hostile work environment claim is not artificially limited to [the] actions by Newton or . . . Stone," but "includes the actions by Deputy Arnold, Deputy Michael, Sergeant Wallace, Lieutenant McAnally, Captain Moore, and Major Farley, all of which occurred after Swindle made a formal complaint" of sexual harassment.  (Doc. 50 at 38.)  According to plaintiff, the events that occurred after she reported the sexual harassment "contributed to the hostile work environment," were not discrete acts of retaliation, and "all . . . occurred well within the 180 day period prior to the filing of [the EEOC] charge."  (*Id.*)  In response to Sheriff Hale's second argument, plaintiff maintains that "[e]ven if the [c]ourt were to accept the many distinctions urged by [Sheriff Hale], [plaintiff's] charge remains timely under *Morgan*" because "[plaintiff] informed Sergeant West during her March 27, 2008 interview that the incident where Stone reached between her legs and touched her upper thigh happened 'not even a month ago.'"  (*Id.* at 39 [citing doc. 38-4 at 68-72; doc. 38-14; doc. 38-15.].)  The court will address these two timeliness issues in turn.

First, the court agrees with Sheriff Hale that the events that occurred after plaintiff reported the sexual harassment on March 26, 2008 were single and discrete acts of alleged retaliation that are not considered part of plaintiff's hostile work environment claim.  In *Freeman v. City of Riverdale*, 330 F. App'x 863, (11th Cir. 2009), the plaintiff brought an action against his employer, the City of Riverdale, alleging racial discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964.  The district court granted summary judgment in favor of the City of Riverdale, and the plaintiff appealed.  On appeal, the plaintiff argued that he presented sufficient evidence to establish a hostile work environment.  More specifically, the plaintiff argued that, among other things, his two terminations, his assignment to janitorial tasks upon reinstatement, and the denial of his requests for training established a hostile work environment.  The Eleventh Circuit disagreed and held that the plaintiff could not "establish a hostile work environment by reference to his . . . terminations, his assignment to janitorial tasks upon reinstatement, or the denial of his requests for training, because they were discrete acts that were required to be challenged separately.  *Id.* at 866. In doing so, the Eleventh Circuit stated:

> In determining whether claims are timely, courts must distinguish between allegations which charge discrete acts of discrimination or retaliation from allegations that charge repeated acts or events centering on discrimination, intimidation, and ridicule.  *McCann* [*v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008)]. The former grouping constitutes "discrete acts that must be challenged as separate statutory discrimination and retaliation claims," while the latter grouping is viewed as a single, continuous unlawful employment practice.  *Id.*  We have held that hiring decisions, work

30

> assignments, and alleged retaliation claims constitute discrete acts and not acts that are considered part of a hostile work environment. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008). Discrete acts are subject to time-bar if a charge is not filed within 180 days. *Id.*

*Freeman*, 330 F. App'x at 866.

As in *Freeman* and *Davis*, the alleged retaliatory acts that occurred after plaintiff reported the sexual harassment "constitute[] discrete acts, not acts that were part of a hostile work environment." *Davis*, 516 F.3d at 970. Plaintiff complains about the following incidents that occurred after she reported the sexual harassment: she was told that she would have to transfer; that other employees were told about her complaint; the handling of the report by Deputy Michael and subsequent investigation; denial of medical leave; that Deputy Arnold refused to provide her with transportation; that she was required to take a polygraph test; that she was required to ride to a job in a patrol unit that has a cage; and that she was required to perform alone duties that required more than one person to perform. These incidents are unrelated to plaintiff's gender and are analogous to the retaliation claims in *Davis* and *Freeman*. These acts cannot rationally be viewed as part of a "single . . . unlawful employment practice" because the acts are distinctly separate from, and lack continuity with, the acts and practices that comprise plaintiff's hostile work environment claim. *Freeman*, 330 F. App'x. at 866. Moreover, a close reading of the Complaint reveals that these acts were alleged as discrete acts of retaliation, not acts that were part of a continuous practice of sex discrimination by

31

Sheriff Hale.  (*See* doc. 1.)  Therefore, plaintiff's hostile work environment claim cannot be made timely on the basis of these acts.

Second, even though the court finds that the events that occurred after plaintiff reported the sexual harassment on March 26, 2008 were single and discrete acts of retaliation, the court finds, for the purposes of summary judgment, that the incident where Stone reached between plaintiff's legs occurred sometime after February 23, 2008, which is within 180 days of plaintiff's EEOC Charge. In *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984), the "Eleventh Circuit accepted the proposition that an affidavit can be disregarded when it constitutes a sham." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  In *Van T. Junkins*, the President of Van T. Junkins "made crystal clear in three places in the deposition" that there was no condition attached to their agreement that he was required to purchase one of their buildings in order to be awarded a dealership. 736 F.2d at 657.  He later submitted an affidavit stating that he would be awarded the dealership only if he would purchase one of their buildings.  The Eleventh Circuit held that the affidavit should be disregarded as a sham.  Its flat contradiction to the earlier deposition was unexplained and therefore was inadequate to raise a genuine issue of fact which was denied to exist by the earlier deposition.  *Id.* at 657-59.

Following *Van T. Junkins*, the Eleventh Circuit in *Tippens v. Celotex* discussed the distinction between "discrepancies which create transparent shams" and "discrepancies

which create an issue of credibility or go to the weight of the evidence." 805 F.2d at 953.

The court stated:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. "An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).
>
> The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins*[, 736 F.2d] at 657.

*Tippens*, 805 F.2d at 953-54.

Here, according to the transcript of plaintiff's interview with Sergeant

West on March 27, 2008:

> The time that he reached in between my legs ***was actually probably not even a month ago***, to grab the cell phone.

(Doc. 38-14 at 16 [emphasis added].)

33

In paragraph 12, the Complaint alleges:

Since Plaintiff began her employment with Jefferson County Sheriff's Department, ***up to and including December 2007***, she was sexually harassed by two deputies, Randy Stone and David Newton. Deputy David Newton was her supervisor at the time.

(Doc. 1 ¶ 12 [emphasis added].)

However, in paragraph 23, the Complaint alleges:

***In February 2008***, Plaintiff and Deputy Stone were on the roadblock checking driver's licenses. She was sitting in the driver's seat with the window rolled down. Deputy Newton was standing in the road. Deputy Stone walked over to the window where she was sitting with her cell phone between her legs. Stone reached in and said "give me that phone" and attempted to grab the phone between her legs. She put her right hand on the phone and shooed his arm away with the left hand, instructing him to leave her phone alone.

(*Id.* ¶ 23 [emphasis added].)

In her deposition on January 17, 2011, plaintiff testified as follows:

Q: Okay, your next allegation about Deputy Stone again is in paragraph 23 of the complaint where he allegedly reached into a car and attempted to grab a cell phone that was between your legs. Tell me what happened on that particular occasion.

A: We were at a roadblock. I was sitting in the truck with my window rolled down. There were several laborers and Deputy Newton and Deputy Stone. Deputy Newton had asked me to watch the radar detector. I was sitting in the truck doing that. That way if someone come around the curve speeding I could let them know what speed they were doing. Had my cell phone – I was sitting just in the driver's seat. Had my cell phone right here (indicating)

. . .

34

A: In between my legs. Deputy Stone come over to the window. I was sitting in the driver's side, so it was the driver's side window, which was rolled down, that way they could hear me tell them the speed. He reached down and grabbed my phone from in between my legs and said, Give me that phone, girl. And I popped his hand and said, Leave my phone alone, you have your own cell phone.

. . .

Q: And when did this occur?

A: *It was probably in '07.* I would say *the latter part of '07.* It was very breezy out, I do remember that. That's one reason why I was kind of glad I got to sit in the truck and watch the radar.

Q: *You think it was before Christmas of –*

A: *Oh, yes.*

Q: *-- 2007? Did you say yes?*

A: *Oh, yes, sir.*

(Doc. 38-4 at 68-70 [emphasis added].)

Plaintiff's Declaration states:

. . . *Within a month of my reporting the sexual harassing conduct to Sgt. Saxton (February 2008)*, Deputy Stone approached the weight crew truck in which I was sitting, with the window down. At the time, I was running the radar detector (something I later learned was contrary to the rules). Deputy Stone approached my truck and reached down between the upper part of my thighs and grabbed my phone, which was resting in the crotch area of my pants. I asked him what he was doing and told him to stop.

(Doc. 51-22 ¶ 7 [emphasis added].)

35

Unlike the discrepancy in *Van T. Junkins* and *Tippens*, the discrepancy here does not merely involve an inconsistency between an affidavit and deposition testimony. Rather, the discrepancy involves inconsistencies between plaintiff's testimony in an interview shortly after the incident, the allegations of the Complaint, plaintiff's deposition, and Plaintiff's Declaration. The court finds that to resolve this discrepancy against plaintiff by finding that the references to this incident as having occurred "within a month" of March 27, 2008 are "transparent shams" would "deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth." *Tippens*, 805 F.2d at 953-54. Therefore, resolving all doubt as to the existence of a genuine issue of material fact against the moving party, the court assumes the incident regarding plaintiff's cell phone occurred within 180 days of the filing of her EEOC Charge. Thus, the court finds that plaintiff's charge was timely filed.

## B. THE *FARAGHER-ELLERTH* DEFENSE

Assuming plaintiff could establish that Newton and Stone created a hostile work environment, Sheriff Hale is nevertheless entitled to judgment as matter of law based on the affirmative defense articulated in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

When an employer undertakes a tangible adverse employment action against an employee complaining of a hostile work environment created by an immediate supervisor,

36

the employer is subject to vicarious liability.  *Faragher*, 524 U.S. at 807-08.[9]  However, "[W]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability.  *Id*. at 807.  Thus, in *Faragher* and *Ellerth*, the Supreme Court "created an affirmative defense providing employers a safe harbor from vicarious liability when the victimized employee suffered no tangible employment action."  *Madray v. Public Supermarkets, Inc.*, 208 F.3d 1290, 1296 (11th Cir. 2000) (citations omitted).  Here, plaintiff did not suffer any tangible employment action as a result of the claimed sexual discrimination.  The *Faragher-Ellerth* defense is available to an employee defending against a claim of hostile environment discrimination.  *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007)

The employer must satisfy two elements to successfully interpose the affirmative defense: (1)  that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.* at 1303 & 1306 (citations omitted).  The employer bears the burden of establishing both of these elements.  *Id*. at 1303.

--------

[9]In her brief in opposition to Sheriff Hale's Motion for Summary Judgment, plaintiff argues that Sheriff Hale can be liable for Stone's actions because "Stone was . . . a deputy sheriff and therefore Swindle and the other laborers were required to follow his instructions at work." (Doc. 50 at 41.)  Plaintiff testified in her deposition that Stone was not her supervisor.  (Doc. 38-4 at 60-61.)  Sheriff Hale argues that there is no evidence that Stone ever exerted any authority over plaintiff.  (Doc. 54 at 14 n.5.)  Based on the grounds argued by Sheriff Hale for summary judgment, it is not necessary for the court to determine whether Sheriff Hale could be held vicariously liable for Stone's actions.

Plaintiff maintains that the Sexual Harassment Policy was defective because "JCSO employees were not properly trained, . . . the reporting procedures were not reasonable, and . . . the subsequent investigation and results were not reasonable." (Doc. 50 at 43.) Plaintiff testified that Newton "told us on numerous occasions we were not to speak with any other deputy or sergeant, that he was our supervisor, we were to go to him." (Doc. 38-4 at 44.) Plaintiff contends that the policy manual "fails to explain how it applies to employees of the JCSO" and more specifically how it applies to unclassified positions such as plaintiff's position. (Doc. 50 at 43.) Plaintiff also argues that Newton and Stone "did not understand the policy." (Doc. 50 at 43-44.)[10]

As to the first element of the defense, the evidence before the court is that the JCSO has a valid Sexual Harassment Policy that was disseminated to all employees, including the plaintiff. The policy contained reasonable reporting requirements. The policy defined sexual harassment and required that victims promptly report harassment to their supervisor or their supervisor's supervisor or the County Attorney or the Employee Relations Officer. The Eleventh Circuit has found similar policies to be reasonable. *See*

---

[10] On the subject of training on sexual harassment Stone testified:

Q:   When is the last time you remember having any training on sexual harassment?
A:   I don't remember.  It's been - - it's been awhile.
Q:   Do you remember ever having any training on sexual harassment?
A:   I'm sure that I did, but I don't remember it.  I don't remember the class.  (Doc. 51-1 at 22.)

Newton testified that he did not remember any training on "EEO matters" at the "academy" he attended after he was hired.  (Doc. 51-2 at 13.)

38

*Madray*, 208 F.3d at 1298-99 (policy directing employees to report sexual harassment to "the Store Manager, District Manager, or Divisional Personnel Managers," or "anyone in management" was a reasonable policy); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) (policy directing employees to report sexual harassment to their "line manager, Personnel Contact or other manager with whom they feel comfortable" was a reasonable policy).

Once plaintiff complained of sexual harassment, the alleged harassers, Stone and Newton, were placed on administrative leave. Stone was fired as a result of the investigation; Newton was fired over matters which came to light as result of the investigation. The Eleventh Circuit has "held that warnings and counseling of the harasser are enough where the allegations are substantiated." *Baldwin*, 480 F.3d at 1305 (citing *Fleming v. Boeing Co.*, 120 F.3d 242, 246-47 (11th Cir. 1997). Because warning the harasser and counseling him may be sufficient, certainly termination is sufficient action to attempt to correct the problem. Thus, the evidence establishes that Sheriff Hale "exercised reasonable care" to prevent sexually harassing behavior.

The second element requires the employer to show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. "Once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then it is incumbent upon the

employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Madray*, 208 F.3d at 1300 (internal citations and quotation marks omitted).  "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765.   In this case, Sheriff Hale's evidence is sufficient to establish the second element of the defense.  Plaintiff contends that Newton's first sexual harassment began in 2006.  She did not report this to anyone at the JCSO until 2008.  She also did not report Stone's first act of sexual harassment to anyone other than Newton for two years.[11]

There is no evidence before the court that plaintiff did not understand the Sexual Harassment Policy.  Namely, there is no evidence that plaintiff was confused about the Policy's reporting requirements or to whom a report could be made.  The Policy specifically provides to whom employees were to complain in the event of sexual harassment.  Plaintiff was aware of the Sexual Harassment Policy and had undergone instruction on sexual harassment shortly after she was hired.  She had a "prompt reporting

---

[11]   Plaintiff could have reported Stone's actions to other people per the Sexual Harassment Policy.  She reported to Newton despite the fact that Newton himself had already allegedly sexually harassed the plaintiff on several occasions.  Although Newton allegedly failed to address plaintiff's allegation against Stone, she did not report Stone's comments to anyone else despite the reporting requirement and clear options for reporting harassment offered in the Sexual Harassment Policy.

duty under the prophylactic rules the Supreme Court built into Title VII in the *Faragher* and *Ellerth* decisions." *Baldwin*, 480 F.3d at 1306.  As the Eleventh Circuit has noted, "[t]he rules of those decisions place obligations and duties not only on the employer but also on the employee.  One of the primary obligations that the employee has under those rules is to take full advantage of the employer's preventative measures." *Id*. at 1306-07.

Plaintiff's delay in reporting the harassment was not reasonable.  She gave a number of reasons for her delay in reporting the harassment including that she was afraid of Newton, that he would have her fired, that she had a jealous husband, that she did not want to cause Newton job problems, that she did not want to cause Newton marital problems, that she tried to cover-up for people, that she thought conditions would improve, and that Newton told plaintiff and others that he was their supervisor and that they were "to go through him."  None of these reasons offered by plaintiff prevent application of the affirmative defense to this case.  Plaintiff "unreasonably failed to take advantage" of the preventative and corrective opportunities provided in the Sexual Harassment Policy. As the court in *Baldwin* noted:

> While we have recognized that filing a sexual harassment complaint may be "uncomfortable, scary or both," we have also explained that "the problem of workplace discrimination . . . cannot be [corrected] without the cooperation of the victims." The *Faragher* and *Ellerth* decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment.

*Baldwin*, 480 F.3d at 1307 (internal citations omitted).

Based on the evidence before the court, Sheriff Hale has established both elements of the *Faragher-Ellerth* defense, and is therefore entitled to judgment as a matter of law on plaintiff's claim of sexual harassment.

## C. FAILURE TO ADMINISTRATIVELY EXHAUST

Sheriff Hale contends that plaintiff has failed to administratively exhaust certain sex discrimination and retaliation claims.  First, Sheriff Hale contends that "[s]ince Swindle's EEOC Charge only discusses the events that occurred on or after March 26, 2008 in terms of retaliation, Swindle cannot bring a sex discrimination claim regarding those events because such a claim has not been administratively exhausted."  (Doc. 38-1 at 38.)  Second, Sheriff Hale contends that many of plaintiff's retaliation claims, namely that the Bessemer Division handled the investigation, that Deputy Arnold allegedly refused to provide her transportation, that she had to undergo a polygraph related to having her feet in her fiancé's lap, that she was denied medical care and leave, that Sheriff Hale did not respond to her grievance, that she was not called to testify at Stone's PBJC hearing, that Newton and Stone were returned to the Bessemer Division, and have not been administratively exhausted because they occurred prior to the EEOC Charge and were not included in the EEOC Charge.  (*Id.* at 39-40.)  Plaintiff contends that Sheriff Hale's argument that certain retaliation claims have not been exhausted is flawed because "Swindle is not required to allege every known or possible fact or to prove her entire case through her charge of discrimination."  (Doc. 50 at 55.)  The court will address the two failure to exhaust issues in turn.

42

First, Eleventh Circuit case law makes clear, as Sheriff Hale correctly points out, that "[i]f an EEOC charge discusses acts under one Title VII theory, an employee cannot sue an employer under a different Title VII theory for those acts because such a claim has not been administratively exhausted." (Doc. 38-1 at 38.)  In *Thomas v. Miami Dade Pub. Health Trust*, 369 F. App'x. 19 (11th Cir. 2010), the plaintiff filed an action against her former employer for discrimination in violation of Title VII.  *Id.* at 20. The plaintiff's complaint alleged, among other things, that her employer failed to promote her as a result of race and sex discrimination, not retaliation.  *Id.* at 22.  Plaintiff's EEOC charge against her employer, however, alleged that her employer failed to promote her only as a result of retaliation.  *Id.*  The Eleventh Circuit held that because the plaintiff's EEOC charge asserted the failure to promote her was only a result of retaliation, not race and sex discrimination, the plaintiff's "race and sex discrimination allegations [based on the failure to promote] were not administratively exhausted and were thus barred." *Id.*

Here, as in *Thomas*, plaintiff alleged in her EEOC Charge that the events that occurred after March 26, 2008 occurred as a result of retaliation for reporting Newton and Stone's sexual harassment, not as a result of sex discrimination.  More specifically, in her Amended Charge, plaintiff alleged:

> On March 26, 2008, I filed sexual harassment claims with the employer against two deputies I work with.  My immediate Supervisor, at the time, was one of the offenders.  ***After my complaint***, ***I was retaliated against***, ***in the following respect:***  by being told I would have to transfer, by having other employees being told of my complaint, by being required to take a polygraph test to prove that my allegations [of sexual harassment] were true, by being required to ride to a job in a patrol unit that has a cage, by

43

being required to perform alone . . . duties that required more than one
person to perform, and by being issued a written warning for allegedly
having my feet in my fiancée's lap.

(Doc. 38-27 at 2.)  Because plaintiff's EEOC Charge alleges that the events after March

26, 2008 only occurred as a result of retaliation, plaintiff cannot bring a sex

discrimination suit against Sheriff Hale based on the same events.  *See Cotton v. G.S.

Dev.*, 390 F. App'x 875, 877 (11th Cir. 2010)("It is clear from the face of the EEOC

charge of discrimination that Cotton failed to mention his hostile work environment claim

and only discussed his failure to promote and wrongful demotion and termination claims.

Because Cotton failed to raise his hostile work environment claim in his EEOC charge, he

did not exhaust his remedies with the EEOC with respect to this claim.").  Plaintiff's sex

discrimination claim, to the extent it includes the events that occurred after March 26,

2008, has not been administratively exhausted and is thus barred.

Second, the court agrees with Sheriff Hale that some of the plaintiff's retaliation

claims have not been administratively exhausted.  The Eleventh Circuit has described the

relationship between an EEOC charge and the ensuing judicial complaint:

> The starting point of ascertaining the permissible scope of a
> judicial complaint alleging employment discrimination is the
> administrative charge and investigation. No action alleging a
> violation of Title VII may be brought unless the alleged
> discrimination has been made the subject of a timely-filed
> EEOC charge. EEOC regulations provide that charges should
> contain, among other things, "[a] clear and concise statement
> of the facts, including pertinent dates, constituting the
> alleged unlawful employment practices." A "plaintiff's
> judicial complaint is limited by the scope of the EEOC
> investigation which can reasonably be expected to grow out

44

of the charge of discrimination."

*A.M. Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1332 (11th Cir. 2000) (internal

citations omitted) *overruled on other grounds by Manders v. Lee,* 338 F.3d 1304, 1328

n.52 (11th Cir. 2003).  Judicial claims are proper if they " 'amplify, clarify, or more

clearly focus' the allegations in the EEOC complaint, but . . . allegations of new acts of

discrimination are inappropriate." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277,

1279-80 (11th Cir. 2004) (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)).

Further, "a court must determine if the allegations in the complaint were like or related to,

or grew out of, the allegations in the EEOC charge."  *Miami Dade Pub. Health Trust*, 369

F. App'x at 22 (citing *Gregory*, 355 F.3d at 1280).

Count II of the Complaint is titled "Title VII Violation of Retaliation" and alleges

retaliation based on the events that occurred after plaintiff reported the sexual harassment

on March 26, 2008.  (*See* doc. 1 at 10-12.)  Specifically, the Complaint alleges that

plaintiff (1) "was retaliated against by being told she would have to work at the Bessemer

office[,]" (2) "was retaliated against by being made to do things that required more than

one person by herself[,]" (3) "was retaliated against by having other employees being told

of her sexual harassment complaint that was supposed to be confidential[,]" (4) "was

retaliated against by being required to ride to a job in a patrol unit that had a cage[,]" (5)

"was retaliated against by being called in to Lt. David McAnally's office for a counseling

for allegedly having her feet in her fiancee's lap while on duty[,]" and (6) "was retaliated

against by being required to undergo a polygraph examination to prove that her side of the

story regarding Ron Michael[']s allegations of her having her feet in her fiance's lap was true." (*Id.*)

Plaintiff did not include in her EEOC charge any argument that she was retaliated against by having to work at the Bessemer office, that Deputy Arnold allegedly refused to provide her transportation, that she was denied medical care and leave, that Sheriff Hale did not respond to her grievance, or that Newton and Stone were returned to the Bessemer Division.  To the extent plaintiff seeks to claim these acts as a basis for retaliation, the court finds they are due to be dismissed for failure to exhaust.  As noted above, a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.  These allegations are not like or related to the allegations in the EEOC Charge.  Therefore, they have not been administratively exhausted.  Moreover, regardless of whether these acts were administratively exhausted, they are not alleged as grounds for retaliation in the Complaint.  And, even if considered on the merits, they not adverse actions for purposes of establishing a prima facie case of retaliation.


## D. PRIMA FACIE CASE - RETALIATION IN VIOLATION OF TITLE VII

In order to establish a prima facie case of retaliation in violation of Title VII, plaintiff must establish:  (1) a statutorily protected expression;  (2) an adverse employment action;  and (3) a causal link between the protected expression and the adverse action.  *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

To establish an adverse employment action that will support a claim of unlawful retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)(quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)(quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005))) (internal quotations omitted).  The Supreme Court used the term "material adversity because [it stated that it] believe[d] it [was] important to separate significant from trivial harms."  *Id.*  This standard differs from the standard for establishing an adverse employment action in a race discrimination claim. *Id.* at 67 ("[W]e conclude that Title VII's substantive provision and its antiretaliation provision are not coterminous. . . . We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.'").

Here, plaintiff engaged in statutorily protected activity when she reported the sexual harassment on March 26, 2008.  The acts of alleged retaliation occurring after plaintiff's complaint are detailed above.  The court has carefully considered each of defendant's alleged retaliatory acts.  None of these acts, considered alone or collectively, rise to the level that they would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Thus, plaintiff has failed to establish "an adverse

47

employment action," which is the second element of her prima facie case of retaliation. Because plaintiff has failed to establish a prima facie case of retaliation Sheriff Hale is entitled to judgment as a matter of law on plaintiff's claims of retaliation.[12]

## IV. CONCLUSION

For the foregoing reasons, Defendant Mike Hale's Motion for Summary Judgment, (doc. 38), is due to be granted.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE,** this 30th day of September, 2012.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

[12]Because the court finds that the acts are not adverse actions, the court will not address the third element of a prima facie case, that being a causal relationship between the protected activity and the adverse action.

48